

FILED
COURT OF APPEALS
STATE OF WASHINGTON

2014 JUN 16 AM 9: 03

# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>               Respondent,<br><br>v.<br><br>PATRICK AUBLE,<br><br>               Appellant. | No. 69147-3-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br>FILED: June 16, 2014 |

SPEARMAN, C.J. — After a jury convicted Patrick Auble for rendering criminal assistance, he moved to arrest the judgment, arguing that his conviction rested on his own uncorroborated statements and therefore violated the corpus delicti rule. The superior court ruled that Auble could not raise this claim for the first time after trial. Because the superior court did not err in denying Auble's motion, and because Auble's conviction is supported by sufficient evidence, we affirm.

## FACTS

On July 23, 2011, twelve people were shot during a car show and rap concert in Kent, Washington. Following an investigation, the State charged five people with either first degree assault or drive by shooting. Based on evidence that Patrick Auble hindered the investigation, the State charged him with first degree rendering criminal assistance.

Auble represented himself at trial. In his opening statement, he told the jury that shortly after the car show shooting, but before he knew it had occurred,

he and his brother Shea went to pick up supplies for a party Auble was having that evening. While they were driving, Shea made a phone call to Nick Moreno, a person later charged in the shooting. They subsequently met Moreno at a gas station, bought him some gas, and invited him to the party.

During the party, Auble and some guests decided to shoot guns at a shooting range on Auble's property. As they walked to the range, police arrived and started asking questions. They arrested four people, including Auble's brother Shea, for outstanding warrants and/or firearm violations. The police also took Auble's guns "for an investigation." Verbatim Report of Proceedings (VRP) (4/24/12) at 17. Auble told the jury he had "no clue" what the investigation was about until he turned on the television and learned of the car show shooting. VRP at 17. He then kicked everyone out of the party, saying "you guys are going to sit there and talk about bragging of a shooting, I don't even want to hear about it, leave." VRP at 18.

As people left the party, several tried to get into Auble's car. He asked what they were doing, and they said his brother let them "put something in there hours ago." VRP at 19. Auble told them they could retrieve whatever it was when his brother got out of jail. The people insisted "we've got to get it now," but Auble kicked everyone out. Id.

Auble then checked the trunk of his car and found a bag containing several guns. He also learned that someone had hidden their car in one of his garages. As the night went on, Auble "called the police several times because

- 2 -

people were talking...about who was doing the shooting." VRP at 20. He said "the shooters that were talking about" included a person nick-named "Dreamer." VRP at 20.

The next day, Auble talked to the police and told them he had the guns in a safe and would be happy to bring them down. He said he did not know who put the guns in his trunk, but his brother Shea knew. He said Shea "needs to get out of jail so he can explain to you guys . . . how he received these guns . . . ." VRP at 22. Auble claimed he gave the police all the information he had, that the police knew where he lived, and that he "wasn't hindering anything." VRP at 23. He ended by telling the jury "I didn't hinder anything. I didn't render anything. The . . . guns were eventually dropped off at an Auburn Police station."

Two 911 calls Auble made during his party were played and transcribed for the jury. In the first call, Auble identified himself and asked questions about Shea's arrest. He then said "I know where the gun, and the car, and the two suspects that were at the Des Moines police shooting that happened a couple hours ago." Exhibit (Ex.) 37 at 3. When asked where they were, Auble said "well when my brother's released I'll tell you exactly where everything is."

In the second 911 call, Auble said "I have one of the guns that was involved in the . . . Kent . . . shooting [.]" Ex. 37 at 6. He identified himself as "Pat Doe" and declined to give his address. He said "I want my guns back" and gave the 911 operator his phone number. Id.

Kent Police Officer Jennifer Pursa investigated the car show shooting. She testified that after learning of Abule's 911 call, she called him at the number he provided during his call. Auble said "he wanted his brother to be released from jail and then he could tell us the name of the shooter, where the gun was, and where the car was." VRP (4/24/12) at 60. Auble refused to identify himself to Officer Pursa. A police dispatcher later contacted Officer Pursa and said that Auble had called back and "wanted to hear from a detective by 1:00 in the morning or stuff was going to start missing" or "disappear." VRP at 61-62.

Sean Estrada testified that he attended the car show and saw a man running and shooting a gun back toward the crowd. The man eventually got into a waiting teal Oldsmobile that left in a hurry. Estrada wrote down the car's license number and gave it to police. The car was owned by Nicholas Moreno. When police eventually located the Oldsmobile several days after the shooting, Moreno was driving. The State later charged Moreno with first degree assault for the car show shooting

Stephanie Rodriguez testified that she attended Auble's party on the day of the shooting. According to Rodriguez, a man at the party said he was one of the shooters at the car show. He said he was running away and shooting while running away. Rodriguez contacted police through an anonymous tip line and identified Nick Moreno from a photo as the man talking at the party.

Detective Rick Gilcrist of the Kent Police Department testified that he assisted in the investigation. He spoke with both Auble and Shea three days

after the shooting. He first interviewed Shea at the jail. Shea said he knew the names of the car show shooters and mentioned specific calibers of the guns used in the shooting. But he refused to give Detective Gilcrist the names.

Detective Gilcrist then interviewed Auble at the Kent police station. Auble offered to give him one of the guns used in the shooting in exchange for Shea's release from jail and the return of Auble's guns. When asked if he would voluntarily give police the gun and the names of the shooters, Auble refused.

Auble knew some details of the shooting, saying it was a gang conflict and that he knew several gang members. He recalled driving with Shea that afternoon and meeting up with an Oldsmobile full of people at a house. Someone in the Oldsmobile put something in the trunk of Auble's car. Auble refused to reveal that person's identity to Detective Gilcrist. Both cars then drove to a gas station and then on to Auble's house. Surveillance video from the gas station showed Auble's and Moreno's vehicles simultaneously pulling into the gas station about an hour and a half after the car show shooting. The video shows Auble paying for gas for Moreno's Oldsmobile.

At some point, Auble was asked to hide the Oldsmobile. He decided to hide it in his mother's garage. He later found a black handgun in the trunk of his own car. He put the gun in a safe.

Auble told Detective Gilcrist that he overheard someone at the party saying "the gun that was placed in the trunk was used in the car show shooting." VRP (4/24/12) at 182. Auble said all three gang members involved in the

shooting were at the party. After the party, someone woke Auble up, asked for the keys to the Oldsmobile in the garage, and drove it away.

Auble called Detective Gilcrist after the interview and said "'you better call your prosecutor friend because if my brother gets filed on tomorrow, I'll have to bail him out and that gun's going to disappear.'" VRP at 185.

Detective Gilcrist also recounted a recorded phone call between Shea and Auble. Shea told Auble that Detective Gilcrist had just come by and asked questions about the shooting. Auble told Shea "'don't say shit to them.'" Shea replied "'I'm good, I ain't no snitch.'" VRP (4/25/12) at 29.

Sergeant Phil Johnson of the Kent Police Department also investigated the shooting. The name "Dreamer" came up early in the investigation. Sergeant Johnson eventually established that "Dreamer" was Nick Moreno. He testified that phone records showed that Moreno called Auble seven times on the day of the shooting. Moreno and Auble each called the other twice the next day. Four days after the shooting, Abule called Moreno eight times. The next day, he called Moreno four times.

Sergeant Johnson testified that Auble never gave the police the names or descriptions of the shooters. Sergeant Johnson testified that not receiving that information, the gun, or the location of the Oldsmobile on the night of the shooting, hindered the investigation.

Detective Heather Vance of the Kent Police Department testified that one of the car show shooters used a .380 caliber handgun. This was consistent with

Auble's statement to police that a gun he found in his trunk was a .380 caliber pistol. The police, however, never recovered a .380 handgun that matched the ballistics evidence at the scene of the shooting.

Several weeks after the shooting, Detective Vance went to Auble's residence to talk to him, but he was not home. Auble later left her a voice message, saying "you can go talk to Detective Gilcrist. . . . I already gave him his option and he didn't do what he said, so I'd appreciate it if you guys wouldn't come to my house anymore." VRP (4/26/12) at 114. Detective Vance testified that, without a gun, the investigation of Nicholas Moreno was "very, very difficult."

Auble testified in his own defense. He claimed he told the police everything he knew. He told them he would bring the gun to the station with Shea when Shea was released, but no one would listen to him. He eventually gave up and took the guns to the Auburn police station.

On cross-examination, Auble testified that he told Auburn police when he dropped off the guns that "Kent wants these." VRP (4/26/12) at 159. He denied telling them that the guns were used in a series of 7-11 store robberies by a man named "CJ". VRP (4/26/12) at 157. Auble then said he told the Auburn police "a little bit of a lie" but the guns were the guns he intended to give to the Kent police.

Auble admitted he knew Nick Moreno at the time of the shooting. He also admitted that he had Moreno's phone number in his cell phone and that Moreno called him multiple times on the day of the shooting. He testified that prior to

calling 911, he knew Nick was driving the car hidden in his garage, that there were guns in the trunk of his own car, that people at the party were bragging about being involved in the shooting, and that the gun and the car were probably used in the shooting. When asked if he ever gave the gun to Detective Gilcrist or Detective Johnson, Auble said they never asked for it.

Officer Douglas Koch of the Auburn Police Department testified that Auble dropped off some guns in September, 2011. Auble said the guns might have been used by a person named CJ in some 7-11 robberies. Auble never mentioned the Kent shootings.

Detective Mike Mellis of the King County Sherriff's Department testified that in the summer of 2011, he investigated a string of armed convenience store robberies. One of the suspects was a person who went by the name "CJ". When Detective Mellis heard about the guns Auble dropped off in Auburn, he spoke with Auble by phone. Auble said that he and his brother had legal trouble. Auble made it clear that he had information about the guns and CJ but would not give it to the detective unless he "could secure some kind of advantage for his brother." VRP (4/30/12) at 50. Auble never suggested that the guns were linked to the Kent shooting.

The jury found Auble guilty as charged and the court imposed a sentence of 12 months in work or education release. Auble retained counsel prior to sentencing and filed a motion for arrest of judgment. He argued that his conviction violated the corpus delicti rule because it relied solely on his

uncorroborated out of court statements. The State argued that there was no violation of the rule, and in any event, Auble did not preserve any error because he failed to object when his statements were admitted.

The court ruled that Auble waived the alleged error by failing to object. Auble appeals.

## DECISION

In his sole assignment of error, Auble contends the trial court erred in denying his motion to arrest the judgment. He contends his conviction violates the corpus delicti rule because the State did not present sufficient evidence corroborating his out-of-court admissions. Characterizing this error as a matter of the sufficiency of the evidence supporting his conviction, he contends the superior court erred in concluding he waived the issue by not raising it at trial. We disagree.

### Arrest of Judgment / Corpus Delicti

We review a decision denying a motion for arrest of judgment de novo. State v. Ceglowski, 103 Wn. App. 346, 349, 12 P.3d 160 (2000). Under the corpus delicti rule, "a defendant's extrajudicial confession or admission is not admissible unless there is independent prima facie proof that the crime charged has been committed by someone." State v. Dodgen, 81 Wn. App. 487, 492, 915 P.2d 531 (1996) (citing State v. Cobelli, 56 Wn. App. 921, 924, 788 P.2d 1081 (1989)). The independent evidence need not be sufficient to support a conviction but must provide prima facie corroboration of the crime described in a

defendant's incriminating statement. <u>State v. Brockob</u>, 159 Wn.2d 311, 328, 150 P.3d 59 (2006). Prima facie corroboration exists if the independent evidence supports a "logical and reasonable inference" of the facts the State seeks to prove. <u>State v. Vangerpen</u>, 125 Wn.2d 782, 796, 888 P.2d 1177 (1995). The rule "is a judicially created rule of evidence, not a constitutional sufficiency of the evidence requirement, and a defendant must make a proper objection to the trial court to preserve the issue." <u>Dodgen</u>, 81 Wn. App. at 492 (citing <u>State v. C.D.W.</u>, 76 Wn. App. 761, 763-64, 887 P.2d 911 (1995)). In addition, we noted in <u>C.D.W.</u> that an objection is required

> because "[i]t may well be that 'proof of the corpus delicti was available and at hand during the trial, but that in the absence of [a] specific objection calling for such proof it was omitted.'"

<u>C.D.W.</u>, 76 Wn. App. at 763-64 (quoting <u>People v. Wright</u>, 52 Cal.3d 367, 404, 802 P.2d 221, 245, 276 Cal.Rptr. 731 (1990). Here, Auble did not object to the admission of his extrajudicial statements under the corpus delicti rule. Under <u>Dodgen</u> and <u>C.D.W.</u>, he waived any objection under the rule.

Citing <u>State v. Aten</u>, 130 Wn.2d 640, 656-57, 927 P.2d 210 (1996), Auble argues that the corpus delicti rule is meant to protect against unjust convictions, and therefore it must have "constitutional sufficiency of the evidence underpinnings." App. Reply Br. at 7. <u>Aten</u> does state that the rule protects defendants from convictions based on confessions of questionable reliability, and the rule does have a sufficiency component related to the sufficiency of the evidence corroborating the confession or admission, but the rule does not have

constitutional underpinnings. State v. Dow, 168 Wn.2d 243, 227 P.3d 1278 (2010). Nor does Aten or any authority cited by Auble hold that a corpus delicti issue may be raised for the first time after trial.[1] In the absence of such authority, we adhere to our decisions in Dodgen and C.D.W. The trial court did not err in ruling that Auble waived his corpus delicti claim by failing to object to the admission of his statements on that basis at trial.

Even if Auble had preserved the issue, his argument would fail for several reasons. First, as the State correctly points out, the corpus delicti rule applies to confessions or admissions, not to statements made during the commission of a crime. See State v. Dyson, 91 Wn. App. 761, 763, 959 P.2d 1138 (1998). Auble's extrajudicial statements were not confessions or admissions of guilt and were made during the commission of his offense. Second, the rule does not apply to in-court statements or testimony. State v. Hummel, 165 Wn. App. 749, 759 n.1, 266 P.3d 269 (2012) rev. denied, 176 Wn.2d 1023, 297 P.3d 708 (2013)("[T]he corpus delicti rule does not apply to statements made in open court."). Aubles' opening statement and in court testimony are outside the ambit of the rule and provide any necessary corroboration for his extrajudicial statements. See State v. Mathis, 73 Wn. App. 341, 346-347, 869 P.2d 106, 109 (1994) ("Mathis testified and confirmed that he had made statements to Morton police officers in which he admitted that he had digitally penetrated L.P. . . . That

---

[1] Auble does not address several cases that possibly lend support to his position. See State v. Grogan, 158 Wn. App. 272, 246 P.3d 196 (2010) (citing Dow, 168 Wn. 2d 243; State v. Pietrzak, 110 Wn. App. 670, 41 P.3d 1240 (2002). Absent briefing from either party on these cases, we decline to address them.

evidence, combined with the testimony of L.P. . . . was sufficient to establish the corpus delicti of the crime independent of the officers' testimony concerning Mathis's statements made to them.); State v. C.M.C., 110 Wn. App. 285, 287, 40 P.3d 690 (2002)(relying in part on defendant's in-court admission to satisfy corpus delicti); State v. Liles-Heide, 94 Wn. App. 569, 970 P.2d 349 (1999)(reviewing courts consider defendant's testimony in determining whether corpus delicti was established).

## Sufficiency of the Evidence

Auble argues in the alternative that the evidence, including his extrajudicial statements, was insufficient to support the elements of first degree rendering criminal assistance. Again, we disagree.

Evidence is sufficient to support a conviction if, viewed in the light most favorable to the State, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. State v. Goodman, 150 Wn. 2d 774, 781, 83 P.3d 410 (2004). A claim of insufficiency admits the truth of the State's evidence and all reasonable inferences that can be drawn therefrom. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial and direct evidence carry equal weight, Goodman, 150 Wn. 2d at 781 (citing State v. DeVries, 149 Wn.2d 842, 849, 72 P.3d 748 (2003), and criminal intent may be inferred from conduct where it is plainly indicated as a matter of logical probability. State v. Johnson, 159 Wn. App. 766, 774, 247 P.3d 11 (2011).

To convict Auble of rendering criminal assistance, the jury had to find that he "rendered criminal assistance" to Nicholas Moreno, that Nicholas Moreno had committed or was being sought for first degree assault, and that Auble knew that Moreno had committed or was being sought for first degree assault. The jury instructions defined "renders criminal assistance" as follows:

> A person "renders criminal assistance" if, with intent to prevent, hinder, or delay the apprehension or prosecution of another person who he knows has committed a crime, or is being sought by law enforcement officials for the commission of a crime, he . . . conceals, alters or destroys any physical evidence that might aid in the discovery or apprehension of such person. Clerk's Papers at 90.

Viewed in a light most favorable to the State, the evidence was sufficient for a rational trier of fact to convict Auble of rendering criminal assistance. The evidence either established or supported reasonable inferences that prior to calling 911, Auble knew Nick Moreno was involved in the shooting and, with intent to prevent, hinder, or delay Moreno's apprehension or prosecution, he concealed physical evidence — i.e., the car and gun — that might have aided in Moreno's discovery or apprehension.

Contrary to Auble's assertions, State v. Budik, 173 Wn.2d 727, 272 P.3d 816 (2012), did not require the State to also prove an affirmative act in order to convict him of rendering criminal assistance. Budik held that rendering criminal assistance requires more than a false denial of knowledge and that the State must prove an affirmative act *or statement* indicating intent to shield or protect a suspect. Budik, 173 Wn.2d at 736-37. Prior to the police apprehending Moreno,

No. 69147-3-I/14

Auble hid Moreno's car and gun, told police he knew who the suspect was and where his gun and car were, and then refused to reveal the information unless his brother was released from jail. These acts and statements satisfy Budik.

Affirmed.

_Spearman, C.J._

WE CONCUR:

_Dwyer, J._      _Schindler, J._